*306 MR. JUSTICE WEBER
dissenting:
I respectfully dissent.
The majority opinion sets forth the full text of Instruction No. 18, which is the sudden emergency instruction given in this case. It should be noted that this instruction is a duplicate of the sudden emergency instruction given in Dawe v. Dalley (1972), 161 Mont. 73, 504 P.2d 982. In the Dawe case, the Dailey car had followed the Dawe vehicle for approximately three-quarters of a mile up the north side of Boulder Hill on Highway 91 in Jefferson County. The Dawe car was observed to have difficulty negotiating the hill and was fishtailing. When the car started down the south side, they were traveling no faster than 15 miles per hour, with Dailey testifying he was trying to keep 50-75 feet behind the Dawe vehicle. Upon reaching a sharp curve the Dawe vehicle went out of control with front wheels colliding with a snowbank and the rear end sliding around. At this point Dailey tried to turn to the left but was unable to do so because of oncoming traffic. He then applied brakes and slid into the Dawe vehicle. Based upon these facts, this Court in a unanimous decision agreed that it was proper to give the sudden emergency instruction. The Court stated:
“We are also of the opinion that the court did not err in instructing the jury with reference to the emergency doctrine. An instruction on this theory should always be given where it is consistent with the theory of one of the parties to the action and where the evidence submitted by such party would sustain a finding that he had been confronted with a sudden peril or emergency and acted under its stress.’” 161 Mont. at 76, 504 P.2d at 984.
The Court further quoted from the Montana rules stated in Peabody v. Northern Pac, Ry. Co. (1927), 80 Mont. 492, 498, 261 P. 261, 262:
“Tf the evidence in this case were sufficient to warrant a reasonable conclusion that at the time in question the defendant . . . was confronted with a “sudden emergency”, or that “there was want of time in which to form a judgment”, under *307 the circumstances, as they appeared to him, the court should have given the offered instructions.’ Emphasis supplied.” 161 Mont. at 76, 504 P.2d at 984.
At the time of the trial of the present case, the holding in Dawe had not been modified or overturned. No specific reference is made to this case in the majority opinion.
The majority opinion makes an extensive reference to the Kudma case. It should be noted that the quoted portions of that case are essentially dicta. In Kudma this Court found that the doctrine of sudden emergency could not be applied because the truck driver had created his own emergency by his own negligent acts.
Following the quotation from Kudma and Prosser the majority opinion refers to the annotation in 80 ALR 2d 1 and points out that before the instruction on the doctrine of sudden emergency is given, the evidence should be sufficient to support a finding that (1) the claimed emergency actually or apparently existed; (2) the apparent situation was not created or contributed to by the person confronted; (3) alternative courses of action in meeting the emergency were open to such person or there was an opportunity to take some action to avert the threatened casualty; (4) the action or course taken was such as would or might have been taken by a person of reasonable prudence in the same or similar situation. The majority then seeks to apply the facts to the foregoing rules and arrives at a conclusion that the instruction was improper.
We respectfully submit that there has been a failure on the part of the majority to accurately analyze the facts in the present case. The evidence on the point of impact of the vehicles is in direct conflict. The majority opinion makes reference to the evidence of collision debris in the southbound lane of traffic and the testimony of the highway patrol officer that the point of impact was in the southbound lane, that being the lane of the plaintiffs’ car. That evidence is certainly significant and is unfavorable to the defendant. However, it should be noted that there is extensive evidence contradicting the patrolman’s conclusion as to the point of impact. In a similar manner, there is extensive testimony which positively states that the plaintiffs’ car made two complete spins on the icy highway, fishtail *308 ed back and forth, and slid sideways across from its own lane of traffic into the' lane of traffic of the northbound truck, colliding with the truck in the northbound lane of traffic. The accident occurred in the town of Ravalli in an area posted for 45 miles per hour travel. The evidence indicates the truck was driving north at 25-35 miles per hour and that the plaintiffs’ car was driving south down Ravalli Hill at a speed of 35 miles per hour or possibly faster. That evidence shows that the sudden emergency so far as the truck driver was concerned was the sliding sideways across into his traffic lane of the Eslinger car.
Mark Fitch, 40 years of age, with 22 years of driving experience, was seated in the Bison Cafe, which is next to the highway and adjacent to the point of collision. Key parts of Mr. Fitch’s testimony are:
“A. Well, the car (Eslinger car) was headed south, coming off of Ravalli Hill, and when it got close to the intersection of 200 at the foot of the hill, it seemed to start fishtailing out of control and started two clockwise spins still heading south.

ÍÍ

“Q. How fast was the blue car (Eslinger car) traveling as it approached the intersection heading toward Thompson Falls? A. I would guess between thirty - thirty-five miles an hour.
“Q. You indicated that it started to fishtail; is that right? A. Yes.
“Q. Can you tell the jury in your own words what your conception of a fishtailing maneuver is? A. The back end trying to pass the front end.
“Q. What did you do when you saw it attempting to fishtail? A. Well, I watched it go into a couple of clockwise spins,and then I immediately looked south, because my wife was supposed to meet me.
“Q. Why is it that you looked south? A. She drives a Chevrolet Chevette, and I was concerned she may be the next car in line.

U

“Q. Based upon your twenty-two years of driving experience, was the blue car in control as it proceeded from the Thompson Falls intersection southerly? A. No.
*309 “Q. As you looked southerly towards the direction to which you thought your wife was approaching, did you have the opportunity to see any other vehicle? A. Yes, there was a truck approaching headed north.
“Q. Could you tell, based upon your observation of that truck at that place and time, how fast it was traveling? A. I would guess approximately thirty- thirty-five miles an hour.
“Q. At the time you saw the truck, which lane of traffic was it in, the right lane. Excuse me, strike that. Was it in the northbound lane or the southbound lane? A. It was in the northbound lane.
“Q. Had you driven that particular roadway before? A. Many times.
“Q. Were you familiar with where the snow berms were on the side and where the centerline was underneath the snowpack? A. Yes.
“Q. As the truck proceeded further northerly, did it stay in the northbound lane? A. Yes, it did.
“Q. Mr. Fitch, I’ll ask some more specific questions later, but will you tell this jury in your own words exactly what you saw as the truck and the car approached each other. A. Just a little bit south of what used to be the Texaco station there the truck was in the northbound lane, and the car seemed to be starting into another spin and was sitting crossways in the northbound lane, at which time the truck contacted it at about the passenger or the driver’s door, which would be the left side, with the left front corner of the vehicle, truck, and proceeded to shove it back up the highway, I would guess a hundred - hundred and fifty feet. First contact the truck immediately — the tractor jackknifed, made contact about a hundred feet - a hundred fifty feet up the road, at which time it hit the right side of the truck, still hitting the driver’s side of the car, shoving it off to the west of the highway, and the trailer then continued to spin around and slide off to the west side of the highway.
“Q. Mr. Fitch, when the first contact was made between the car and the truck, was the truck in the northbound lane or in the southbound lane? A. Was in the northbound lane.
“Q. When the car first made contact with the truck, was it in *310 the northbound lane or in the southbound lane? A. Mostly in the northbound lane.
“Q. Was the car at that particular point in time with its nose headed south, or was it sideways? A. A little sideways, still primarily headed south.

"

“Q. Did you, from where you were seated, hear these various impacts that took place? A. Yes, I did.
“Q. Did you hear the first impact when you saw it take place? A. Yes.
“Q. Approximately how many seconds elapsed before the second impact took place? A. Five, three, four, five seconds, very short period of time.
“Q. Approximately five seconds? A. Approximately.
“Q. Can you describe to the jury what happened to the car at the time of the first impact? A. Yes, it was shoved back up the highway, that would be north, which it went a little bit to the southbound lane, and on the second impact then it took place in the southbound lane.”
Virginia Butler, who had lived in the Ravalli area for 37 years and been driving a car for 20 years, also testified. She also was seated next to a window in the Bison Cafe, directly opposite the point of collision. She testified at length as to her observations of both vehicles. She confirmed that the Eslinger car was going virtually sideways on the highway. She testified that the car was traveling faster than the truck. She further confirmed that the truck was in its correct lane, that being the northbound lane, and that just prior to the impact, the car was in the wrong lane, that being the northbound lane as well. She also confirmed that she heard two loud noises, with the second noise being several seconds after the first. She testified that the truck ended up swerving around after the collision and itself heading south.
Howard Skiles, driver of the truck testified as mentioned in the majority opinion. He testified to the application of brakes on the truck and trailer, which resulted in a sliding or locking, after which he released such brakes. It was this application of brakes which the defendant contends was the action on the part of the truck driver which was justified because of the sudden emergency. In pertinent part Skiles testified:
*311 “A. I started to pull to the right and I hit my brakes and I seen that wasn’t the right thing to do so I got right back off them and the vehicle started to lock up.
“Q. What happened when you hit your brakes? A. It started to lock up.
“Q. And what occurred when it started to lock up? A. It started to slide and I immediately let off.
“Q. What direction did it start to slide? A. Just down the street.
“Q. Was it going straight? A. Fairly straight, yes.
“Q. In what position was the trailer at this point? It was behind me.
“Q. Did the trailer start to come forward? A. No, I let off on the brakes before they had a chance. I just barely tapped them.
“Q. You tapped the brakes, you felt the vehicle lock up — I think that’s the term you used — and slide. You went into a skid. A. Started to.
“Q. Then what happened? A. I let off the brakes, looked back and he started to fishtail and he turned about half sideways and he was coming right at me.
“Q. Where was your vehicle at this time and this is just before the impact? A. Well, there is no way for me to really — The vehicle itself, mine was — it was well over in my lane at the time of impact.
“Q. Your vehicle was in the northbound lane at the time of the impact? A. Yes.
“Q. Did it ever slide over to the southbound lane? A. That street is plowed real wide right there. That must be over seventy feet of street right there but it was way over on my side.

"

“Q. Did you ever cross the centerline? A. No.”
Officer Magone did testify as follows with regard to the point of impact:
“Q. Is there any question in your mind, officer, about where the impact of this accident occurred? A. No, sir.
“Q. And it occurred, as you said, in the southbound lane, close to the west edge, I think you said of the asphalt? A. It is *312 difficult to tell exactly where the edge of the lane was, but it was on the west side, yes, in the southbound lane; kind of hard to tell right where the lane is there due to the snow cover, but from the centerline over to this point we would put it on the edge of the lane.”
Reviewing the evidence in the light most favorable to the defendant, as required, we would hold that the findings required under the annotation from 80 ALR 2d.l, cited in the majority opinion have been met:
1) The claimed emergency which actually existed was the sliding of the Eslinger car sideways into the truck’s lane of traffic.
2) The perilous situation was not created by the truck driver - the truck driver testified “I seen him coming down the hill before he ever got to the junction. I didn’t pay that much attention to him until he got within 100 yards of me.” The majority has suggested this is an indication of negligence. That cannot be implied where the evidence shows that he was driving at 25-35 miles per hour. Note, there is no other evidence showing negligence on the part of the truck driver with the exception of the reference to the point of collision by the evidence of the highway patrolman.
3) Alternative courses of action in meeting the emergency were open to the truck driver - clearly it made sense for him to turn right and apply the brakes as he did.
4) The action taken was such as might have been taken by a person of reasonable prudence in the same or similar situations - this seems to have been an entirely appropriate course of action to be taken by a reasonably prudent person. While the application of the brakes did cause some locking and possibly sliding, the immediate release of the brakes allowed the truck and trailers to remain in the proper lane.
Our case is directly comparable to Hood v. Williamson (1972), 7 Wash.App. 355, 499 P.2d 68. In the Hood case, there was a head-on collision where the occupants of the vehicles were both killed and there was conflicting evidence concerning the lane in which the collision occurred. With regard to the emergency instruction similar to the instruction here given, the court stated:
*313 “An emergency instruction is properly applied on behalf of the driver of a car on its own side of the road, when confronted with a car on the wrong side of the road. [Citation omitted.] There was substantial evidence to justify giving the emergency instruction on behalf of both plaintiff and defendant.” 499 P.2d at 72. In the fact situation of the present case, the emergency instruction could be applicable to both the plaintiffs’ and defendant’s side of the case. The plaintiffs could have argued that the application of the brakes, locking of the wheels, and sliding of the truck was an emergency which required a response on the part of the Eslingers. On the other hand, as argued by the defendant, the sideways sliding of the Eslinger vehicle into the wrong traffic lane clearly required an emergency response by the truck driver.
We find that both plaintiffs and defendant were represented by very competent counsel, and presented all of the evidence available in behalf of each side. There were striking conflicts in the evidence. After due consideration, the jury found that the negligence of the Eslingers was 100% of the cause of the accident, and that there was no negligence on the part of the truck driver. We would affirm the judgment of the lower court.
MR. CHIEF JUSTICE HASWELL and MR. JUSTICE HARRISON concur.